No. 00-275

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 66

IN THE MATTER OF THE

ADOPTION OF C.C.L.B., a Minor.

APPEAL FROM: District Court of the Twenty-first Judicial District,

In and for the County of Ravalli,

Honorable Jeffrey H. Langton, Judge Presiding

COUNSEL OF RECORD:

For Appellants:

Darcy M. Crum, Rebeck & Crum, Great Falls, Montana

For Respondents:

Mary Rose Heller, Department of Public Health and Human

Services, Helena, Montana

Richard Weber, Koch, Johnson, Weber & Goheen, Hamilton, Montana

Dustin Gahagan, Waters, Smith & Gahagan, Hamilton, Montana

(Guardian ad Litem)

Submitted on Briefs: October 26, 2000
Decided: April 18, 2001

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 The "Greens" adopted C.B. on May 26, 1999, through a judicial decree of adoption in the Twenty-first Judicial District Court. The "Whites" also wanted to adopt C.B. and filed a motion to intervene and to set aside the Greens' final decree of adoption.[1] The District Court determined that the Whites' motions were untimely and that they had no standing to intervene or set aside the final decree. We affirm.

## FACTUAL BACKGROUND

¶2 This case began in July 1996, when the Montana Department of Public Health and Human Services (DPHHS) removed C.B. from the custody of her natural mother and placed her in temporary foster care with the Greens. At the time, C.B. was a little less than a year old. C.B.'s natural father had never taken any responsibility for her care, but DPHHS had developed a treatment plan for C.B.'s natural mother with the hope of reuniting the family. By October 1997, however, it was clear the plan would not be successful, and DPHHS began proceedings to terminate parental rights. By this time, C.B. had been with the Greens for seventeen months, and they decided to pursue permanent adoption, pending the outcome of the termination proceeding. Mrs. White is C.B.'s second cousin. After she learned of the termination proceeding through C.B.'s aunt, the Whites contacted DPHHS to express their interest in adopting C.B. They hoped that, by doing so, C.B. would be able to maintain ties to her natural family.

¶3 From this point forward, the case developed along three lines: the parental rights' termination action initiated by DPHHS, the adoption proceeding initiated by the Greens and the adoption proceeding initiated by the Whites. The DPHHS termination action and the Greens' adoption petition were filed in the Twenty-first Judicial District, Ravalli County, where C.B. lives. The Whites filed their adoption petition in the Twelfth Judicial District, Choteau County, where they live. Initially, neither the Twenty-first Judicial District Court nor the Twelfth Judicial District Court knew there was a competing adoption petition pending in the other court. Later, the Whites filed post-judgment motions to intervene in both the termination proceeding and the Greens' adoption petition.

## A. Intervention in the Termination Proceeding

¶4 The Twenty-first Judicial District Court terminated the parental rights of C.B.'s mother and father in March 1998; at the same time it granted custody of C.B. to DPHHS and authorized it to consent to her adoption. When DPHHS subsequently gave its consent to adopt to the Greens, the Whites attempted to intervene in the termination proceeding-despite the fact that some six months had passed since the District Court's final order. Although the Whites' motion to intervene in the termination proceeding is not at issue on appeal, its history and outcome are relevant to the questions of how and why the Whites came to file their motion to intervene in the Greens' adoption petition.

¶5 Well before the termination hearing, DPHHS told the Whites that, before they could be approved as adoptive parents or initiate visits with C.B., they would need to go through a preadoptive evaluation and training process. This involved a study to assess the conditions in the Whites' home and their suitability as adoptive parents. DPHHS also recommended that the Whites complete a training program for potential foster parents. In addition, the Whites undertook numerous lengthy trips to the Greens' home to begin to become acquainted with C.B.

¶6 The termination hearing was held in March 1998. The Whites completed the recommended programs and evaluations in July 1998. Shortly thereafter, DPHHS staff approved their home as "an adoptive resource" and recommended placement of C.B. with the Whites. These developments led the Whites to believe that DPHHS would support their efforts to adopt C.B. However, like the Whites, the Greens were also being reviewed by DPHHS as potential adoptive parents for C.B. In August 1998, DPHHS determined that C.B. had formed a strong bond in her current foster placement and that it would be in her best interests to stay with the Greens. In response, the Whites moved to intervene in the termination action, the only legal proceeding that had been filed to date. The Whites, who contend that they are members of C.B.'s extended family, argued that DPHHS should have given them priority as adoptive parents.

¶7 The District Court determined that the Whites failed to state sufficient grounds for intervention in the termination proceeding:

> [The Whites] do not appear to be challenging the Court's decision to terminate . . . parental rights and give [DPHHS] permanent legal custody, or the Court's decision to grant [DPHHS] the right to consent to adoption. Instead, the substance of the briefs leads the Court to determine that the [Whites] are seeking judicial review of

> [DPHHS's] decision to approve the [Greens] as C.B.'s adoptive family. The [Whites] do not set forth any authority for judicial review of the Department's placement determination, and the statutes governing placement of youths do not provide for any such review . . . .

The District Court also determined that the motion to intervene was untimely. It noted that the Whites' motion to intervene came almost two years after initial investigatory authority was granted and almost eight months after parental rights had been terminated. Citing § 42-2-620, MCA, which limits the time to question a termination order to six months, the District Court denied their motion.

¶8 The District Court went on to recommend that a more appropriate forum for the Whites to seek judicial review of DPHHS's decision would be in "an action against [DPHHS], or *in the separate adoption proceeding, should . . . the [Greens] file such an action*." (Emphasis added.) The Whites did not follow either recommendation, electing instead to file their own adoption petition in the Twelfth Judicial District Court.

B. Motion to Intervene in the Greens' Adoption Action

¶9 By the summer of 1998, C.B. had been with the Greens for nearly two years. They formally filed their petition to adopt on March 17, 1999, after DPHHS indicated that it would give them its consent to adopt and after the Whites' motion to intervene in the termination proceeding had been denied. The Twenty-first Judicial District Court granted the Greens' petition on May 26, 1999. The Whites filed their motion to intervene and set aside the adoption on December 9, 1999, more than six months after the final decree and more than three years after C.B. was first placed in the Greens' care.

¶10 The Whites made their motion to intervene pursuant to Rule 24(a), M.R.Civ.P., which specifies conditions under which an applicant shall be allowed to intervene in an action as a matter of right, and Rule 24(b), M.R.Civ.P., which sets outs conditions under which the court may, at its discretion, allow intervention. The Whites also argued that the Greens' adoption decree should be set aside under the provisions of Rule 60(b)(3), (4) and (6), M.R.Civ.P.

¶11 The District Court determined that the Whites had no standing to intervene as a matter of right under Rule 24(a), M.R.Civ.P., and that permissive intervention under Rule 24(b), M.R.Civ.P., was both untimely and would undermine the purpose of adoption: to "help a

child become a permanent member of a nurturing family that can give the child the care, protection, and opportunities essential for healthy personal growth and development." The District Court denied the Whites' Rule 60(b) motion to set aside the decree on the grounds that, as nonparties to the Greens' adoption petition, they had no standing to make such a motion and that, in any case, the motion was untimely, coming more than 180 days after the final decree. On appeal, the Whites raise the following issues:

¶12 Issue 1. Did the District Court err when it denied the Whites' motion to intervene in the Greens' adoption petition?

¶13 Issue 2. Did the District Court err when it denied the Whites' motion to set aside the Greens' final decree of adoption?

## DISCUSSION

¶14 Under Rule 24, M.R.Civ.P., intervention may be either as a matter of right or by permission of the court. The District Court denied the Whites' motion for intervention as a matter of right on the grounds that they showed no legally-protected interest that entitled them to intervene. It denied the motion for permissive intervention on the grounds that the motion was not timely.

A. Intervention as a Matter of Right

¶15 Under Rule 24(a), M.R.Civ.P., upon timely application, anyone must be allowed to intervene in an action:

> (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest . . . .

The Whites do not cite a statute that provides them with an unconditional right to intervene. Rather, they rely on Rule 24(a)(2), M.R.Civ.P., arguing that they have a legal "interest relating to the . . . transaction" by virtue of the extended family placement preference in the Indian Child Welfare Act (ICWA) and various legislative and departmental policies favoring adoptive placement with extended family members. The

Greens respond that ICWA is inapplicable to this case and that the policies cited by the Whites do not create a sufficient interest to compel intervention. We agree.

¶16 A mere claim of interest is insufficient to support intervention as a matter of right. DeVoe v. State (1997), 281 Mont. 356, 363, 935 P.2d 256, 260 (citing Aniballi v. Aniballi (1992), 255 Mont. 384, 386-87, 842 P.2d 342, 343-44). Rather, the party seeking inter-vention must make a prima facie showing of a direct, substantial, legally-protectable interest in the proceedings. *Aniballi*, 255 Mont. at 387, 842 P.2d at 344. A district court's deter-mination regarding whether a party has made such a showing is a conclusion of law which we review for correctness. *DeVoe*, 281 Mont. at 363, 935 P.2d at 260.

¶17 Although nothing in the record suggests that C.B. is an Indian child, the Whites claim an interest based on ICWA's extended family placement preferences for such children. They cite In re the Matter of M.E.M. (1986), 223 Mont. 234, 725 P.2d 212, in which we concluded that the aunt of an Indian child had an interest in adoption proceedings stemming from the extended family placement provision of ICWA. We held that this statutory preference, as well as Montana's own "strong and independent commitment to the principles embodied in ICWA," created a sufficient interest to meet the criteria for mandatory intervention in Rule 24(a), M.R.Civ.P. *M.E.M.*, 223 Mont. at 237, 725 P.2d at 214. However, as the Greens point out, ICWA and our holding in *M.E.M.* are inapplicable to the case before us because C.B. is not an "Indian child."

¶18 As part of the preadoption process, DPHHS must certify whether the child is subject to ICWA. The ICWA reporting form filed with the District Court indicates that C.B. is not an Indian child, that she is not an enrolled member of any tribe and that she is not eligible to be enrolled in any tribe. The Whites do not dispute this certification. Therefore, the extended family placement preferences of ICWA and our holding in *M.E.M.* do not apply to C.B.'s adoption. We must conclude, as did the District Court, that ICWA does not provide the Whites with an interest sufficient to entitle them to intervene under Rule 24(a)(2), M.R.Civ.P.

¶19 The Whites also contend that various statutory and DPHHS policies create a legal interest in extended family members in the adoption of a child. It is not necessary to examine these policies and statutes in detail because, even if the broad statements of policy cited by the Whites were sufficient to create a legal interest in *someone*, they would not be sufficient to create a legal interest in the Whites. The Whites, although they are related to C.B., are not "extended family members" as that term is employed in Montana

adoption law. Under Montana law, "extended family member" means a person who is or was the "adoptee's parent, grandparent, aunt or uncle, brother or sister, or child." Section 42-1-103(11), MCA. The Whites are C.B.'s second cousins and, therefore, are not "extended family members" as that term applies to adoptees.

¶20 We conclude that the Whites have not established a direct, substantial, legally protectable interest in the proceedings, and the District Court correctly concluded that they do not have a sufficient claim of interest to intervene as a matter of right.

B. Permissive Intervention

¶21 The Whites also contend that they should have been allowed to intervene under the permissive standard of Rule 24(b), M.R.Civ.P., because the competing adoption petitions had common issues of law and fact. The District Court held that the motion for permissive intervention was not timely and would unduly prejudice the parties-most specifically, C.B. herself. We agree with the District Court's analysis and conclusion.

¶22 Whether intervention is sought as a matter of right under Rule 24(a) or by permission under Rule 24(b), timeliness is a threshold issue. Estate of Schwenke v. Becktold (1992), 252 Mont. 127, 133, 827 P.2d 808, 811; Stallworth v. Monsanto (5th Cir. 1977), 558 F.2d 257, 263. Rule 24(b), M.R.Civ.P., provides that:

> Upon *timely application* anyone may be permitted to intervene in an action (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. [Emphasis added.]

The District Court determined that the Whites' motion was untimely because it came more than six months after the final adoption decree and because reopening the adoption proceedings would not be in C.B.'s best interests. The Whites do not deny that their motion came well after the final adoption decree. Rather, they contend that their delay should be excused by their reliance on misrepresentations made by DPHHS. The record suggests that DPHHS could have taken a more forthright approach in their dealings with the Whites and, by doing so, could have saved all the parties considerable time and expense. However, we conclude that the Whites knew of the Greens' adoption petition and

were, themselves, responsible for ensuring that their motion to intervene was filed in a timely fashion.

¶23 Rule 24(b) provides no criteria for determining when a motion to intervene is timely. As a result, the question is largely committed to the sound discretion of the trial court. *Schwenke*, 252 Mont. at 133, 827 P.2d at 811 (citing NAACP v. New York (1973), 413 U. S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648, 663); *Stallworth*, 558 F.2d at 263. We will not overturn the District Court's determination of timeliness absent an abuse of discretion. Goodover v. Lindy's, Inc. (1988), 232 Mont. 302, 313, 757 P.2d 1290, 1297; *Stallworth*, 558 F.2d at 263.

¶24 The Whites made their motion to intervene more than six months after the District Court entered its final decree of adoption. While motions to intervene made after a judgment are not *per se* untimely, they are not favored. See *Goodover*, 232 Mont. at 313, 757 P.2d at 1297 (citing In re Marriage of Glass (1985), 215 Mont. 248, 253, 697 P.2d, 96, 99); Houston Gen. Ins. Co. v. Moore (4th Cir. 1999), 193 F.3d 838, 839-40 (citing 7C Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1916, at 444-45 (West 1986)). In considering the timeliness of a motion to intervene, the majority of courts look to four factors: (1) the length of time the intervenor knew or should have known of its interest in the case before moving to intervene; (2) the prejudice to the original parties, if intervention is granted, resulting from the intervenor's delay in making its application to intervene; (3) the prejudice to the intervenor if the motion is denied; and (4) any unusual circumstances mitigating for or against a determination that the application is timely. *Stallworth*, 558 F.2d at 264-66. None of these factors are, by themselves, dispositive.

¶25 1. <u>The length of time the intervenor knew or should have known of its interest in the case before moving to intervene.</u>

¶26 The Whites filed their motion to intervene on December 9, 1999. The record indicates that they knew of the Greens' competing attempt to adopt C.B. well in advance of that date. In its order denying their motion to intervene, the District Court stated that "the [Whites] were well aware since November 1997, that [C.B.] was available for adoption and that [DPHHS] intended to place the child with the [Greens]." The basis for this statement is not evident in the record but affidavits filed with the Whites' motion to intervene indicate that Mrs. White knew of the Greens' competing home study in June 1998 and, in September 1998, learned that the placement committee met and decided to place C.B. with the Greens instead of the Whites. On March 8, 1999, in its order denying

the Whites' motion to intervene in the termination proceeding, the Twenty-first Judicial District Court suggested that they intervene in the Greens' adoption petition- should one be filed. The Whites knew the Greens' petition to adopt C.B. would be forthcoming, and, in fact, it was filed on March 17, 1999, less than ten days later.

¶27 Even ignoring what the Whites should have known, its clear that they had actual knowledge of the Greens' petition before the final decree. On May 17, 1999, DPHHS informed the Whites, through their counsel, that the Greens had filed a petition to adopt C. B. At this point, the final adoption decree had not yet been entered and would not be for more than a week. Even after DPHHS informed them of the final decree, on June 11, 1999, the Whites took no action until December 9, 1999.

¶28 The Whites knew of the Greens' competing interest in adopting C.B. from at least June 1998 when Mrs. White learned of the Greens' home study. They could have applied to intervene before a final decree was entered but did not do so, despite being on notice from their failed attempt to intervene in the termination proceeding that timeliness would be an issue. Even after being informed that a final decree had been entered, they waited an additional six months before attempting to protect their interests. These facts, in conjunction with the general rule disfavoring postjudgment intervention, weigh heavily against a conclusion that the Whites made a timely motion to intervene in the Greens' adoption proceeding.

¶29 2. <u>The prejudice to the original parties, if intervention is granted, resulting from the intervenor's delay in making its application to intervene</u>.

¶30 The prejudice to the original parties to the litigation that is relevant to the question of timeliness is only that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he or she knew or reasonably should have known about his or her interest in the action. *Stallworth*, 558 F.2d at 265. This factor is distinct from the requirement in Rule 24(b), M.R.Civ.P., that the court consider whether intervention, if granted, will cause undue delay or prejudice the adjudication of the original parties' rights.

¶31 As discussed above, the Whites did not file their motion to intervene until December 9, 1999, more than six months after the final decree. Had the Whites filed their petition earlier-even before the final decree had been entered-it is likely that the hearing on the Greens' petition would have been rescheduled and the proceedings would have been delayed. As a consequence, we cannot say that the six-month delay significantly

prejudiced either the Greens or DPHHS. It is more likely, however, that the delay prejudiced C.B., herself. During the six or seven months the Whites waited to file their motion to intervene, C.B. continued to bond with the Greens. Given this consideration, we conclude that this second factor also weighs against a conclusion of timeliness.

¶32 3. The prejudice to the intervenor if the motion is denied.

¶33 Consideration of the third factor weighs in favor of the Whites. Denial of the motion to intervene effectively precludes any hope of their adopting C.B. Since DPHHS consent was required before anyone could adopt C.B. and that consent had been given to the Greens, it seems highly unlikely that the Whites could have prevailed in any consolidated proceeding. Nonetheless, they would have at least been allowed to make their case.

¶34 4. Any unusual circumstances mitigating for or against a determination that the application is untimely.

¶35 There are two unusual circumstances in the case. First, the Whites clearly lay the blame for their delay on DPHHS, which they accuse of misrepresentation, if not outright fraud, in its dealings with them. Second, the case deals with an adoption of a young child with the attendant concerns for permanent placement. These considerations have offsetting implications for the determination of timeliness. If DPHHS were responsible for the late motion to intervene, it would tend to excuse the Whites' delay. Conversely, the strong preference for permanent placement in adoption proceedings militates against tolerating any delay for all but the most compelling reasons.

¶36 The Whites contend that DPHHS misled them into believing they would be allowed to adopt C.B. when it undertook a home study, encouraged them to make costly and time-consuming visits to the Greens' home in Ravalli County, gave them a favorable recommendation and approved their home as an "adoptive resource." Furthermore, they contend that DPHHS and the Greens actively denied them the right to have their petition heard by failing to give them timely notice of the Greens' petition and by failing to inform the District Court that the Whites had filed a competing petition in another judicial district.

¶37 We find these contentions unpersuasive. First, DPHHS was faced with two families who wanted to adopt C.B. Under these circumstances, its review of both the Whites' and the Greens' homes was a normal part of the preadoption process. Even if there had been no competing petition from the Greens, approval and staff recommendation of the Whites'

home as a potential placement for C.B. did not signify that DPHHS would give them its consent to adopt. Ultimately DPHHS decided, pursuant to the authority granted to it by the District Court, that it would be in C.B.'s best interest to be placed with the Greens. After making this decision in August 1998, DPHHS promptly informed the Whites. We find no duplicity or misrepresentation in these actions. Rather, the record only shows that DPHHS fairly evaluated both the Whites and the Greens before making a final decision.

¶38 Furthermore, neither DPHHS nor the Greens were under any statutory obligation to notify the Whites that the Greens had filed a petition to adopt C.B. The law requires only that the Greens send one copy of their petition to the department or agency participating in the proceeding. Section 42-5-101(3), MCA. This having been said, while DPHHS had no statutory obligation to notify the Whites that the Greens had filed their adoption petition, doing so would have probably saved the Whites, the Greens, the courts and DPHHS, itself, a great deal of time and trouble. DPHHS defends its actions simply by stating that it followed all procedural requirements and had no obligation to do more. This "we didn't do it because we didn't have to" attitude is counter-productive to all parties involved. We encourage DPHHS to adopt a more open and straightforward approach when dealing with families such as the Whites who have gone to tremendous time and expense to open their hearts and home to a disadvantaged young child. However, despite what we see as a less than commendable approach on the part of DPHHS, the Whites have failed to show that either DPHHS or the Greens were obligated to provide them with notice of the Greens' petition.

¶39 The Whites also make much of the fact that DPHHS knew of the Whites petition at least two weeks before the District Court finalized the Greens' decree. They argue that once DPHHS knew of their competing petition, it was required to inform the District Court under § 42-5-101(1)(k), MCA. However, this section merely states that "A petition . . . must specify . . . whether a previous petition has been filed *by the petitioners* to adopt the child at issue." (Emphasis added.) It does not require DPHHS to do anything and only required the Greens to inform the court of its own prior petitions, not petitions filed by other parties.

¶40 The Whites also contend that, once they filed their petition in the Twelfth Judicial District Court, the adoption should have been treated as a "contested adoption" under § 42-5-107(2), MCA. This section requires the court to consider the "nature and length of any family relationship between the child and any person seeking to adopt the child" whenever the adoption is "contested." The section neither defines "contested adoption" nor says how

a contested adoption is brought before a court-only what factors the court must consider once it is there. The Whites imply that this section created a duty on the part of DPHHS to bring their competing petition to the attention of the District Court but they provide no authority for their contention that it was DPHHS's duty rather than their own.

¶41 Finally, the Whites suggest that their delay was somehow justified by an order issued by the Twelfth Judicial District Court. After the Twenty-first Judicial District Court entered its final decree of adoption, DPHHS filed a motion to dismiss the Whites' petition in the Twelfth Judicial District Court. The Twelfth Judicial District Court then gave the Whites until December 1, 1999, to show cause why it should not dismiss the case. However, this deadline in no way limited the Whites' ability to intervene in the Greens' proceeding, and the Whites give no reason why it had to expire before they could file their motion to intervene.

¶42 We conclude that none of the "unusual circumstances" in this case favor a determination that the Whites' motion to intervene was timely. The Whites have not made any convincing argument for their claim that DPHHS is to blame for the delay. Absent such a showing, we must conclude that the State's interest in permanent and secure placement for C.B. weighs heavily in favor of the District Court's denial of the Whites' motion to intervene.

¶43 While one of the four factors examined above weighs slightly in favor of the Whites' intervention, the others weigh strongly against it. Therefore, we are convinced that the District Court made a reasoned analysis when it determined that the Whites' motion to intervene was untimely and did not abuse its discretion when it denied the Whites' motion to intervene under the permissive standard of Rule 24, M.R.Civ.P.

¶44 Issue 2: Did the District Court err when it denied the Whites' motion to set aside the Greens' final decree of adoption?

¶45 The Whites moved to set aside the final adoption decree pursuant to Rule 60(b)(3), (4) and (6), M.R.Civ.P. Rule 60(b) allows the district courts to relieve any *party* from a final judgment or order for a variety of grounds including fraud, that the judgment is void, and for any other reason justifying relief from the operation of the judgment. The motion must be made within a reasonable time; generally no more than 60 days after the judgment.

¶46 The District Court held that the Whites did not have standing to set aside the final

decree of adoption because they were not parties to that action and, in any case, their motion, filed more than six months after the final decree of adoption, was not timely. Since the Whites do not address these threshold issues on appeal, we conclude that the District Court properly denied their motion.

¶47 The order of the District Court is affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

1. Pseudonyms have been used to protect the privacy of the parties.